Good afternoon all. Our case for argument this afternoon is Baer v. Neal. Mr. Friedman. Good afternoon. May it please the court. I'd like to discuss issues one and three today, starting with issues three, which involves the quality of counsel's representation at the penalty day. It's the most facts-intensive, I think. There's no dispute that Michael Baer committed these two tragic murders. The only debate is whether he suffered from a history of mental illness that led to diminished moral culpability. Counsel had a compelling and a substantial theory to defeat the death penalty. I'll give the highlights of that. Brain dysfunction, generational family dysfunction, a family history of alcohol and drug abuse, and abuse of methamphetamines. This mitigation was brought out in the penalty phase by Dr. Cunningham in a skeleton-like fashion. He was a good witness, but it simply was not enough to defeat the death penalty without the hard core evidence to back him up. Counsel could have corroborated his analysis by key pieces of evidence. Failure to do so made him ineffective. It was easy for the state to argue that the mitigation that was presented by trial counsel was all lies, and they used that term. The defendant had lied to the doctors, he lied about the history of the met use at the time of the crime, the history of huffing of the chemicals, and the state argued there was not a shred of evidence in the case about the mental illness, or there was even a causal connection with the crime itself. He simply was malingering, and that the mitigation investigation was made up by his thick lawyers. Even the trial court, when they did the sentencing, said, based on the evidence and the record, I believe, about his meth use at the time, this fabrication, and they were just making this up as an excuse. There was a lot of non-cumulative evidence that could have been presented that would have abated the attacks and defeated the death penalty. In fact, I mean, the whole scheme of this case is that the evidence wasn't there at trial, and then when it came for the new evidence to come in in mitigation, it was all cumulative. First, counsel could have done a complete neuropsychological assessment of the defendant. In post-conviction, they used Dr. Harvey, a neuropsychologist. He found that he suffered from cognitive impairments consistent with brain dysfunction, memory disorder, a long history of psychiatric symptoms that was exacerbated by substance abuse. That was his diagnosis? That's correct. It was more than that. It was also that he contributed to impulsive and violent behavior. He was uncertain whether he had some of this before the drug abuse of the meth, which is dangerous stuff, or that it just really exacerbated it. What was his medical term for the ultimate diagnosis? The ultimate diagnosis was, he used the term that he had cognitive impairments. That means he's got something wrong with his thinking process. Yes, correct. But that's not a diagnosis of a mental disorder. He found that the mental disorder was that it was, well, it is a part of disorder, I think. No, it's a symptom of disorder, but what was the disorder? He was psychotic. What psychosis? Did he pin down or didn't he? He pinned down, he believed that he was hearing voices, hallucinations. He couldn't tell whether that independently, candidly, was that independent of the drugs. So he couldn't rule that he could have been schizophrenic. He didn't rule that. He didn't say that? He couldn't, but he believed that. Paranoid? Paranoid disorder, yes. And both of the medical, mental medical health professionals testified fully about that, correct? They were not as clear as the, they didn't do the neuropsychological assessment that clearly brought it out. Even when Dr. Cunningham testified in mitigation, he said the evidence of the brain dysfunction was mixed. You couldn't tell that without a full battery of neuropsychological assessments, which was done. You did the count. How many doctors, medical doctors examined him? Overall? All right. Half of the medical? Three testified at trial. And then you had Harvey testifying in post-conviction. You had Laura coming back and changing his testimony in post-conviction. He was examined early on by Goff, and then Moss Blum also testified. I've got four or five now. Maybe six, maybe even seven if you look closely. Was there unanimity of opinion among them as to this disability? Not exactly as to the pinpoint of the diagnosis, but they all found him to be mentally ill. That's for sure. I mean, the question, really the question was whether there was any causal connection to his mental illness with the crime. And at trial, a good example, Dr. Lohr, who gave the most extensive testimony, the most extensive report that's in the record, initially held that there was no causal connection. But he changed his testimony in post-conviction after reviewing Dr. Harvey's report, the complete neuropsychological assessment, and found that there was a causal connection with the crime due to his neurological deficiencies. And, of course, the jury had heard his testimony during the trial and had witnessed the change in the testimony. They didn't witness the change because the change of the testimony was in post-conviction. Oh, post-conviction, that's right. Not in the death penalty case, that's right. So they didn't really hear that. I mean, going back, Lohr, who the state... Excuse me, one more question. Sure, sure. There were separate juries or seeing the same jury? There was only one jury. The jury that convicted him was also the jury that recommended... That's correct, that's correct. I mean, it's fair to say that the case from the very beginning, from voir dire to the end, was simply a death penalty hearing. They conceded his guilt, and some of the doctors testified in the guilt phase as to the mental illness, and then Dr. Huntingham testified the penalty phase. So there's no issue of fact other than whether or not his mental illness affected the actions he conducted when he killed these two people. Yes, whether it would diminish moral culpability, not to begin being insane. Moral culpability, you know, is a little different. You mean by definition that he was unable to appreciate the criminality of his act or conform his conduct to meet it? That was not the main issue of the case at all. The defense counsels conceded that. The only issue here is diminished moral culpability worthy of the death penalty. Ah, it's a death penalty. And in terms of the difference in testimony, I just want to make sure I have that clear. The testimony covered at trial covered essentially all the same areas of testimony post-conviction, right, as it related to his background and his childhood, because a mitigation specialist testified in the penalty phase. No, no. The only witness that testified at the penalty phase was Dr. Cunningham. She testifies in post-conviction. There's a lot of people testifying here at different times. Mr. Freeman, of all the medical testimony, did it all speak to a lifetime of potential medical infirmity? I believe it did, yes. So pre the crime, the doctors appear to suggest that there was mental illness throughout his history. That's correct. But the problem that really surfaces in this case is that the state kept on saying that he made it up. There's no hard core evidence of it. And the neuropsychological assessments brings that out. And even Dr. Laura thought that he had mental illness, but there was no causal connection. But after seeing Harvey's report, he changed his testimony and said, yes, there's causal connection, which is quite substantial. Also, and this is kind of interesting, I think, in post-conviction, and there was also a big debate throughout this thing as to whether he was hearing voices at the time of the crime, hallucinations. Even Dr. Mossblum, who testified in post-conviction, found that he was hearing voices. Let me use a different term. I am too, but that's because you're talking to me. What's that? I said I'm hearing voices too, but that's because you're talking to me. Yes, yes, yes. I hope I'm talking. Well, I hope at some point you're going to get to the jury instructions because that's the first argument related to that. Yes, yes. Because I'm more concerned with that issue. Okay. But you can finish what you've got. Also, I want to sum up two quick points on the evidence. The toxicologist, get on there, testify. He has no drugs in his system. And the exact language was, was there meth at the time the blood was collected at the blood sample? I would have found it. He says that in trial. He says in post-conviction, test is too old. They waited a year to do that. And that's highly prejudicial. And then I also point out that they should have presented humanizing evidence to verify that he was hearing voices. The best one is William Ogden. He was a counselor when he was there. He talked about what it was like, and he ultimately came to him and said, I'm hearing voices. As to the jury instructions. Yeah, because here's what I want to know. How did the intoxication jury instruction prejudice bear? It prejudice bear by the fact that the jury, looking at the instructions as a whole, as lay jurors, that they believed that they could not have considered the intoxication and drug abuse. Traditionally in Indiana, you're entitled to give an instruction about mitigation and mention. The actual instruction. That defendant's capacity to appreciate criminality, defendant's conduct to conform the conduct to the requirement of the law, was substantially impaired as a result of mental disease or defect or intoxication. That's the normal instruction, carrying out the full statute. It was not put in there. It was not put in there, and they also submitted an instruction. That they could not consider voluntary intoxication. So do you think the jury was misled by the instructions to think that all evidence relating to the methamphetamine use, including mental health exacerbated by the meth use, was precluded from their consideration? Yes, yes, yes. It was done by the fact that it was omitted, specifically omitted in the instructions that traditionally put it in. Plus the instructions concerning that you can't consider voluntary intoxication as a defense of the crime. And it was given in the penalty phase solely for the purpose of the aggravating factors, which the state had approved. But of course, those aggravating factors weren't contested, nor did the instruction explain to the jury that that was only to be considered during the aggravating factor section of the penalty phase. And so that was where the confusion was. And in fact, because when you look at when the instructions were given, there's quite a distance between when the instruction on mitigating factors was given and the involuntary intoxication instruction. They're not tied together in any way. They're separate. One is number 11, and one is 20 and 21. But they also gave an instruction, if I may read, which really I think requires the jury to consider these instructions as a whole and that the Pacific should overrule the General because they said you're to consider all instructions as a whole and ought to regard each with the others given to you. Do not single out any certain sentence or any individual point or instruction and nor the others. I think I know the answer to this, but were two sets of instructions given, one for the guilt phase or was that an accepted thing? And it was, are the instructions given to the jury at the time they were considering the punishment? The penalty, yes. That's the only time they heard this. They heard, I mean, because it goes on three times. They heard the involuntary instruction that you have to intoxication only plays in the guilt phase. They got that instruction. Yes. They got what would be considered 20 and 21 in the guilt phase. Then they got it again, the 20 and 21, in the preliminary instructions before the penalty phase, and then at the final instructions after. So there were three separate instruction periods. Right, yes, but no indication that intoxication and drug abuse could be considered. Were there days or just hours between the instruction periods? That is to say, did they give the instructions, those three sets of instructions, three different times, three different days? I think the trial went on for three or four days. I think the penalty phase went on for a day. I think they might have got the preliminary instruction. I'm just trying to recall. That's what I'm trying to do, what you're doing, figure out. And I think they gave it to them before the, Cunningham took a day to testify, and then they may have given the next day those instructions when the jury had to leave. Were all three sets of instructions tainted in your point of view? Well, I don't think they were tainted in the penalty phase, not in the guilt phase. I think they were tainted in the penalty phase. Because there was no distinction made between when it's in the penalty phase, this factor can be considered. That's correct. Which they had been instructed it could not be considered in the guilt phase. That's correct. That's right. And they also said it couldn't be considered without making it clear that it was to be considered for aggravating factors alone. And then there's no mention of intoxication in the mitigation. And the patent and jury instruction book says they recommend that you should give that instruction if the counsel requests it. The Indiana Supreme Court decision we submit is just simply unreasonable here, and it becomes very circular. They said, well, the judge may have not given it because he didn't believe that there was evidence of intoxication. And it based on the toxicologist's report that there was no med, that he was making it up. But that's circular because that testimony was very deceptive, extremely deceptive, and less than candid. And basically, that toxicologist recanted in post-conviction. And so what did the, what would, just go over the toxicologist's report again. You said there was some confusion. Exactly what was the confusion? All right. The confusion is, I don't think there was any confusion. I think there was some degree of deception. They, I'm going to get to them. At trial, what happened is about three days, four days after they got a hold of Mr. Beer, they did blood testing of him. And then they didn't do the analysis of that blood testing for over a year. And so when the toxicologist testified, he said at trial, well, it's zero. There's no meth, there's no meth in the system whatsoever. And if I did the test, there should be some meth in there. But when you look closely, and all the questioning seems to be how much meth should be in the system after three or four days  and they don't really talk about the fact that the test was done over about 13 months later and by then it only breaks down in the blood. And the toxicologist admitted that. He was told that it was done within that time period. I can't say whether he had any meth in the system at all. And that sort of couched everybody else's testimony, even though, you know, in post-conviction, Dr. Harvey and Dr. Lohr and even Dr. Mossblum said this is a permanent condition when you start using this drug. And you start to have, you know, hallucinations or giving Dr. Mossblum, to the benefit of his doubt, illusionary perceptions. So I think that in just summing it up, unless this Court has any more questions, I think that everything becomes circular in this case. Well, I have some questions, and I'm a little concerned, Mr. Freedman, that there hasn't been enough focus on the issues of life without parole or the comments of the prosecutor, the whole invited response thing. But I'm certainly going to make inquiry of Ms. Lohr. I assume you will rest on your brief. Yeah, I mean, there's a lot of issues in this case. And maybe I indicate that I believe these were the best, the strongest issues and the issues that the Court would have least difficulty. But I'm pleased to answer any questions if this Court wishes. Well, if we haven't, we'll have them in rebuttal, apparently. Thank you. Thank you, Mr. Freedman. Ms. Lohr. Ms. Lohr. May it please the Court. The Union Supreme Court's denial of Mr. Beer's claims of trial and appellate counsel ineffectiveness were reasonable and within the range of defensible positions in accordance with clearly established federal law. Trial counsel was faced with an uphill battle. Mr. Beer's guilt was conclusive. Mr. Beer was caught on two occasions talking about making advice to tell the mental health experts and implicating a member of his defense team to tell him what he needs to say. Mr. Beer gave wildly different accounts of symptoms of his mental health and different versions of the events of the day of the murders. In light of these obstacles, trial counsel devised a reasonable strategy to convince the jury that while they acknowledged shortcomings in the evidence, that the appropriate verdict was guilty but mentally ill. Trial counsel wisely abandoned a strategy to convince the jury that Beer was intoxicated on the day of the murders. Other than Beer's self-report, which varied, no evidence corroborated that he was intoxicated on methamphetamine on the day of the murders. Dr. Evans' testimony about Beer's blood and the analysis came back that there was no amphetamine in the sample that was taken. This was surprising to Dr. Evans because there was traces of THC, which Dr. Evans testified was a less stable molecule. And so since a less stable molecule, the THC, was in the blood, he thought he would find methamphetamine or amphetamine, which is a much more stable molecule. But there was none. In addition, Danny Trosvig, whom Beer said he used methamphetamine with that morning, denied using meth and urine tests during that time period on Mr. Trosvig because he was on probation, came back negative for amphetamine. How long after the events that led to the charge was the blood tested? My best recollection is that it was taken directly after he was arrested. Which was how long after the crime? And that's, I would be guessing if I said perhaps a day or two, a couple of days. That's a good guess, yeah. And Dr. Evans testified within a time period. If Mr. Beer had used a certain amount of methamphetamine within 50 hours of the sample when it was taken, then he would have expected to have seen the more stable amphetamine molecule in the blood that was taken, but he did not. So what was the purpose of the voluntary intoxication instruction at the penalty phase since the guilt and intent had already been decided by the jury? The evidence that Mr. Beer injected into the trial was that he was intoxicated that day. And although that wasn't a strategy pursued by trial counsel, it was still evidence in the record. And the state was required to prove not only, I'm sorry, in the guilt phase they had to prove a knowing or intentional murder, and in the penalty phase they were required to prove an intentional murder, which I do not read any of defense counsel's arguments as saying he didn't intend to murder. So that was still at issue. Well, how can an instruction made during the penalty phase state, intoxication is not a defense and may not be taken into consideration? How can that be interpreted as anything but precluding the consideration of intoxication as a mitigating circumstance? Because the aggravating circumstances are akin to an offense. So the jury was supposed to find, or I'm sorry, the state was still required to establish that he intentionally murdered both Corey and Jenna Clark.  that they could consider any circumstances in mitigation. So it was very specific to mitigation. But then it basically said, I mean, it used the instruction for the trial phase. So how was the state court not precluding relevant mitigating evidence by instructing the jury not to consider intoxication in the penalty phase unless it was involuntary? The involuntary intoxication instruction was given at both the guilt phase and the penalty phase. It was given at the end of both phases. So there's no indication that the jury would be confused that they couldn't consider any evidence or any circumstances regarding mitigation, which is completely different. But is it fair to expect the jury to parse out the difference between when it could and could not consider intoxication based on these instructions? Even because the instructions never stated that intoxication could be considered, but explicitly stated it could not. But in relation to the offense, it was very specific. Each instruction was regarding either the offense or mitigation. So the instructions were very clear. I have a preliminary question. You said that they did not rely on intoxication as a defense. Correct. But it got in the record. How did it get in the record? Because of Mr. Baer's self-reports to some of the mental health experts. So it got in through testimony by people he gave interviews to during his examination. Correct. And the mental health experts could not conclusively say that he was intoxicated. But Dr. Lawler did go as far as to say that the methamphetamine use could have been related to the offense. And he said that in the trial. So it got in accidentally? I'm sorry? I say, so the question of intoxication got in there accidentally? It wasn't put in either by the prosecutors or the defense to advance any particular theory? Well, the defense didn't preclude the information because that was part of what Mr. Baer was relating. So they didn't preclude it, but it was not a strategy. And they testified in post-conviction that it wasn't a strategy based on the fact that the blood analysis came back without amphetamine in his blood. So that was not a strategy that they were advancing as a particular mitigating circumstance. And the law says that if the trial counsel would like a particular mitigating, I'm sorry, statutory mitigating circumstance read into the instructions, that the court may do that. But this was a choice by trial counsel that they were not advancing the theory that he was intoxicated on the day of the murder. Then why tell a jury voluntary intoxication is not a defense? Well, again, that goes to the fact that the penalty phase is twofold. One is the aggravating circumstances, and the other is the mitigating circumstances. That's important at the sentencing. Correct, correct. And the defense counsel strategy was also about being very up front with the jury about what Mr. Baer did and how he committed the murder. So even if there was some confusion in the jury, it's clear there was no prejudice. If we look at the account of the murders given by Mr. Baer through many mental health professionals, and this was a very calculated, he was predatory nature. He had rehearsed this script before. He had gotten into the Clark home the same way that he tried to get into Mrs. Filburn's home earlier that morning, which was to knock on the door and to say I'm lost and to ask if he could use a phone to call his boss. Fortunately for Mrs. Filburn, even though he had a knife, her dog thwarted his efforts, and he decided to abandon it. But that's when he left Mrs. Filburn's house looking at the other houses nearby and saw Jenna taking out the trash, and that's when he then saw his next victim. So he did a U-turn in the road, came back, and did the same script to the Clark residence, even though the 4-year-old girl was the one that answered the door. So let me get back to this intoxication. So trial counsel in the penalty phase never mentioned voluntariness and intoxication. That wasn't part of the argument to the jury at all. Correct. That wasn't part of their strategy. That wasn't part of their argument. Again, they didn't preclude the information getting to the jury, but that certainly was not part of their strategy, and wisely so, based on Dr. Evans' analysis of Mr. Baer's blood. Ms. Lai? Yes. Mr. Friedman and obviously my colleagues have spent some time on Issues 1 and 3. It is Issue 2 that is of some concern to me. That is the alleged ineffectiveness of trial and appellate counsel with regard to the prosecutor's alleged misconduct. So as I look at the case, no question of the horrendousness of how horrendous the crime is, no question of who committed it, and in my judgment, a fair amount of evidence has been presented with regard to his mental capacity. But I am troubled about a discussion about life without parole and what that has to do with this case and the whole invited response. Also, I'd like you to speak to this issue of the personalizing by the prosecutor of his own background. In a capital case, quite often who did it may not be the issue. But if you're seeking the death penalty, you've got to go and impress the jury in a special way that the society demands it. So it's incumbent upon a prosecutor to stay within the chalk lines. And I'm concerned here, and I appreciate that we did not have trial and appellate counsel being very active and objective, but when you impart an issue which has nothing to do with the state of the law in Indiana, why did we have a discourse on life without parole when it wasn't an issue in this trial? I think it's important to note that this issue did come up in voir dire. Yes. And I think the correct inference from reading the back and forth between counsel is that they both mentioned that this was a concern on jury questionnaires. Is that because the presumption is any juror who's placed in a potential position of becoming a juror in a capital case, we're to presume that because there's a national discourse at times about whether people be released short of a full life sentence, is that why we can justify a discussion like this in a trial? I believe it's more specific than that, that the juror questionnaire, the responses came back that there was concern among citizens that life without parole doesn't mean life without parole. So then isn't the appropriate response to say, well, that's not the case in Indiana, not to speculate on whether next year it'll change because the legislature has a different attitude? The discussion finally landed on that note, Your Honor. And, in fact, the prosecutor and the defense attorney said we cannot speculate, that the current law is life without parole is life without parole. Well, you can't speculate. You don't need to speculate, do you? I mean, if the law in Indiana at the time in 2005, the trial? Yes. We know what the law in Indiana is. Both sides know what the law in Indiana is. Isn't it planting a seed when you talk about the speculation that maybe next year the Indiana legislature will change? Don't you think that possibly alters the mind of the jurors who are seated when they're told, yes, this is the law, but tomorrow it might change, or not tomorrow, but soon after it might change? Don't you think that affects the mind of the jurors who actually sit? I think your question presumes that people aren't already thinking about this, and I think that was what was reflected in the jury questionnaires and was a concern, I believe, to both defense and the state, and that's why the topic was broached. Well, it's hard. I don't quite understand why the defense lawyer would be concerned about that. If the state of the law is that you cannot be released in the setting of this case, why a defense lawyer would raise it, I'm not sure, but I know, then, you depend on the invited response by the prosecutor. Yes. It's not the current state of the law. It's the speculation that it will change. Well, you could speculate. Would it be appropriate to say that the governor of the state of Indiana can pardon somebody? Would that have been a fair exchange by the two counsels in this case? Jurors read about clemency not all the time. I have seen that in other trials, but it did not occur in this one. No, I understand. I'm just saying, is that the way we should look at this? Well, perhaps. I think if you have a prospective juror coming to you that has indicated on a questionnaire that they don't believe that life without parole is something that's going to stick and that the legislature could change it, the default is that they're going to then say, well, then the death penalty is appropriate. And that's why defense counsel would want to squarely address this issue with prospective jurors so that they don't have a tendency to think, if I believe LWOP is the appropriate sentence, that one day that may be changed down the road. And so, therefore, I'll default to the death penalty. So I think that is a very important subject matter that defense counsel wanted to broach, and I think that was in response to the questionnaires that came back with this concern by the citizens. And that's why it was broached. But ultimately, I think it's important to note that the jury was told by the state and by the defense that the law right now is that life without parole is life without parole, and that's what it means. So if Judge Flom has no other questions at the moment about that, I'd like to move to use of personal opinion and facts not in evidence, specifically the penalty phase, closing arguments, prosecutor, who tells the jury that there have been at least 125 murders and that three of the defendants have been sentenced to death. And of those 125, no murder even comes close to the murder committed by Mr. Baer, not even the three men who got the death penalty. Do you agree that's very problematic? That was a statement that he made, I believe, in his initial closing argument to the jury. Right, in the penalty phase. And then he goes on further to talk about his mother, who was a prostitute who died of a drug overdose, who got convicted of a felony when she was 18, spent time in jail, and that he, the prosecutor, had the worst childhood ever. And maybe that's why he says, suck it up. If you lived in this community, you would know because people back there did that. I had a tougher childhood than he did, referring to the defendant, and somehow I managed to become a lawyer, got elected prosecutor three times, and me and other people who overcame such tough circumstances like this get six to our stomach when people sit around and cry about how tough they had it. He said that, too, in the trial penalty closing argument. That was in the rebuttal closing argument, and I think that's an important distinction. Oh, because then the defense doesn't even have a chance to respond. No, because the defense opened the door to that line of argument. Right, but opened the door so that the prosecutor could talk about how badly he had it. They talked about how their childhood affected how they, not only how they were raised, but how they ended up being lawyers. You mean the defense lawyers did this? Correct, yes, because they were pleading to the mercy of the jury that Bayer's childhood and his circumstances growing up is what led to his poor decision-making. And the defense attorneys talked about their bad childhood. They talked about their childhood, and they asked the jurors to consider how much and what of an influence it is to have bad circumstances when you're growing up and what a miracle it was essentially that they are. And they were as graphic as the prosecutor? Their circumstances were like the prosecutor's where they . . . Their circumstances were not like the prosecutor's. Right, that's what I want to get to. Okay, none of them stood up and talked about how their mother was a criminal or their father was a criminal or on crack or anything like that, right? They did not have those same circumstances. They talked about the difficulty of struggling as a child and the things that sort of made them who they are and that kind of thing. This graphic description that he made is really quite extraordinary and is particularly in the rebuttal. And it was in response to the defense counsel bringing up their personal lives. Is there anybody in Indiana who led a pleasant life growing up floating around? I'm sorry, say that again? I said is there anybody in Indiana who had a pleasant bucolic life to just grow up normally or do they all live under these terrible circumstances? I would like to think that there are people in Indiana that had a good childhood. I would too. And to the extent that the prosecutor was overzealous or that it was misconduct, if we look at that. So you think those statements were appropriate that he made? I believe that they were. If he would have made those statements initially, that would be a different case. But he made it in response to the defense counsel bringing up their personal lives and their personal childhood. So in your view, there is no line that cannot be crossed by the prosecutor in rebuttal as long as the topic generally has been brought in, bad childhood. It opens the door to these lurid descriptions of his life. Well, it certainly brings in the topic of his personal experience and whether the details of that experience exceed the bounds of what should have been an appropriate rebuttal to defense counsel's arguments. That alone does not provide reasonable probability of a different result at trial. That alone, in light of all of the evidence, he had five aggravating circumstances, intentionally murdering. Oh, I get all of that. To me, the prosecutor went way beyond the pale. The door was not open this wide. This was like a Mack truck running through. And to the extent that he opened the door much wider than it had been based on defense counsel's arguments, that looking at the evidence as a whole and looking at the number and substantial aggravating circumstances and the... Don't you wish he hadn't said it? Never mind, don't answer the question. It's rhetorical. Certainly, it is an issue in this case. Why create one when there isn't any there? But if we look at what is necessary to establish prejudice and we look at the uphill battle that defense counsel had and the number of different statements made by Mr. Bair regarding any drug use, regarding his actions on the day of the murders, and we couple that with five substantial aggravating circumstances, ending in a Supreme Court was reasonable in finding that even if there was misconduct, that this did not show the level of prejudice, meaning a reasonable probability of a different result. Ms. Loy, the prosecutor also injected victim impact evidence, and I'm not going to quarrel whether it crossed the line or not. I think it's certainly understandable. A prosecutor wants to suggest what impact the crime had on family and society in general. But what about the issue of the cost of the prosecution and the very fact that people may have lost jobs to sustain the cost, as I read the transcript, to sustain the prosecution? It says the cost is unbelievable, speaking about the filing of the death penalty. Who knows what it's going to cost our community? Probably half a million dollars. We've got people laid off. I don't suggest that that means because of this case, but he does say it. It's not something you do haphazardly. It's something you do to seek justice in a community. Well, that last response is certainly part of the responsibility of the prosecutor. But why place before the jury the cost of the prosecution? Again, I would take you back to Gladier, where the cost of life without parole or the cost of the death penalty was brought up in questioning the prospective jurors, and it was addressed by defense counsel. So that was a theme, a concern, an interest of prospective jurors that started in Gladier. So there was no jury instruction tendered by the prosecutor saying the cost of any prosecution is irrelevant to your finding of guilt? No, there was no instruction with that information. Of course, none was requested by Trump. None was requested, and it was a topic that was broached by defense counsel in Gladier, again, presumably part of these concerns that came up in the jury questionnaires. So these concerns that came up, were these at the behest of the defense counsel or had questioning been asked specifically by defense counsel about the cost of this kind of prosecution? Or was this just something jurors sort of blurted out just, you know, like do you have any concerns about the kind of case this is? And the juror says, well, it's the cost of the prosecution. Like did it come out like that, or was it an affirmative question by defense counsel about the cost? Your Honor, I don't remember. I remember Attorney Lockwood discussing with prospective jurors regarding the cost of a capital case versus the cost of life without parole because I believe some of them thought that life without parole was more expensive. Who raised that issue first? I'm sorry? Who raised that issue first? The defense counsel, Attorney Lockwood. Ms. White, perhaps this is in the record or perhaps you know generally. In Gladier questionnaires and capital cases in Indiana, is there some open-ended inquiry made? Do you have any concerns that you want to raise about sitting? I don't mean other than inconvenience or job problems. Is that how some of this dialogue starts because you have this inquiry that prospective jurors can just advance these concerns? The jury questionnaire in this case, I don't believe it is part of the record. I didn't think so. But routinely the questionnaires are very elaborate and explore all kinds of reasons or concerns that citizens may have either against life without parole or against the death penalty. So, yes. And you don't have any record evidence as to how this issue was injected by jurors, whether it was an open-ended question by counsel and the juror volunteered or a direct question put by counsel to the juror. I do not remember, Your Honor. And to go back to Your Honor's question about victim impact, it was broached by the prosecutor during Gladier. It was objected to. It was addressed by the judge and the parties agreed that anyone that was on that panel, which the prosecutor did apologize for what he said, that nobody on that panel ultimately sat at the jury. The second reference was in rebuttal closing, and that was after it was brought up by defense counsel in their closing statement in the penalty phase. Then there's another comment by Mr. Cummings where he says, Let me be clear on what I'm telling you. It doesn't mean that he won't be executed if you vote to find him guilty but mentally ill. These lawyers will tell you they believe it's less likely that will occur. The law in this state is not clear. He did not execute retarded people. The next battleground is people who are guilty but mentally ill, and there are cases that the Supreme Court is deciding now, and I suspect they want to be able to argue to the Supreme Court, and it should. I believe what you're referring to is in Voidier, correct? Right. And that was prompted by the defense counsel saying that there was no appreciable difference between a guilty verdict and a guilty but mentally ill verdict. And also, I believe the discussion blossomed into exactly what you said, but it was something that defense counsel broached as well with the Voidier. In Voidier. Yeah, but he was saying there was no difference between the two, correct? Guilty by? Guilty versus. G-V-I, right, versus straight. Guilty but mentally ill, correct. Statutorily, there is no difference. So he was correct in that statement when defense counsel made it? Well, I believe that it's a mixed question, Your Honor, because the law, the Indiana Supreme Court had not settled on whether the Indiana Constitution would be violated if a person had been found guilty but mentally ill. That question was still being debated, and that was not settled. Yeah, but essentially he said that there was no difference, right? And so what the prosecutor then did was go into all this detail about, you know, the Supreme Court and this is what's up in the air and all that kind of thing. Again, was all that necessary? I think it left a false impression in the minds of the jury or the prospective jurors that there wasn't any difference between the two. There was a reason why Mr. Baer wanted a guilty but mentally ill verdict. Right. And so that was the point of the prosecutor's argument during Voidier. But again, the arguments of the prosecutor, whether they were supported by the evidence, whether they were in response to issues brought up in Voidier by prospective jurors or by defense counsel, looking at the prejudice to Mr. Baer, the horrendous nature of the crime, the five substantial aggravating factors, and his deliberate predatory actions at the time show that there was no reasonable probability of a different result. But there are no further questions. We ask that you affirm the district court. All right. Thank you, Ms. Lloyd. Mr. Friedman? Just a few points. I want to indicate clearly intoxication was an issue at the penalty phase. Dr. Cunningham talked about it. He said it exacerbated his psychosis, and he wanted stronger evidence on that. So it was a factor. And the only purpose of the involuntary instruction that was given at the penalty phase was for the aggravating factors, which were never contested. There was never any contest about whether he did the crimes intentionally or not. Never raised an insanity defense. As to claim two, we wrote 20 pages on it. Obviously, there's a lot of issues. We think it's important that the court consider it cumulatively. One of the things that the prosecutor did in this case, he tried to imply that guilty and mentally ill, you couldn't get the death penalty. And that's not the case. Regardless of whether it's ultimately considered as a mitigating factor, you still can get the death penalty. We all know the reason they created guilty but mentally ill is, I guess, the attempted assassination of Reagan. They started modifying insanity statutes and adding guilty but mentally ill. They also tried to talk that they're going to abolish natural life. That's not there. It came out of nowhere. And I believe that the prosecutor began this by overreaching from the very beginning. Everybody can take a look at it. Even some of these claims, in the end, the Supreme Court said they were inappropriate but were harmless error. But it went on. And there's from A to F. And it was quite extensive. So in the penalty phase, do you know exactly how this, I mean, what defense counsel said about their personal situation and their personal growing up? My recollection is very simply that they talked about their life wasn't as bad as theirs. They didn't go over the top. They didn't go into this in extreme detail. That's a subjective opinion. Right. So that's why I'm asking, what did they say? What did they say? Defense counsel say about how they... I believe they said that they were more fortunate that they didn't have his life. That's what I'm trying to give the best... They had a lousy life but not as bad as his. Well, some of them said that. They said they were lucky they didn't become like him. But they didn't get into the details. They didn't go over the top. They didn't go on and on. And they spent a lot of time in their closing arguments at the penalty phase defending themselves because they were accused of being slick lawyers making up the issues and making up the evidence. Who accused them? Who accused them of that and how? What's that? Who accused them of being slick lawyers and how did they make the accusation? Cunningham, the prosecutor, did it, and he said that the evidence was all lies. He did this in the guilt phase, that there was not a shred of evidence, that they came up with this mitigation. That doesn't make him a slick lawyer. No, but the prosecutor accused them of being a slick lawyer. I said what did he say that accused him of being a slick lawyer? That they made up the mitigating evidence. That it wasn't true. It's not too slick making things up, is it? Yes. Yes. I guess that's the definition of a slick lawyer. And there's substantial evidence of that. Usually, we're lucky to find one issue in a case, in this day and age, in a death penalty case, but we had three and we think they were strong issues. We ended with the cumulative. He didn't have his day in court. Considering the mitigation, considering how they mischaracterized the mitigation, how they didn't put the mitigation on, and Dr. Lawyer Cummings was a very good lawyer. In the sense of being very aggressive, maybe inappropriate. I think it's one time he was found inappropriate by this court. You offered the opinion. I'm that kind of a guy. Yeah. So, is there anything else? No, thank you. I guess not. Good job. Mr. Friedman, thank you, and thank the Center for Justice for, again, participating in these important cases. And, Ms. Lloyd, thank you for ably representing the state in this matter, too. Two good lawyers. It makes life easier for us. The case is taken under advisement. The court will stand at recess. Thank you.